**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **STATE NATIONAL INSURANCE COMPANY, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 07-1263 C/W 07-4230** |
| **SETTOON TOWING, LLC, ET AL.** | **SECTION: "S" (1)** |

**ORDER AND REASONS**

　　**IT IS HEREBY ORDERED** that Settoon Towing, LLC's ("Settoon") Motion to Strike Paragraph 2(c) on Page 10 of the Complaint for Declaratory Judgment as it Relates to New York Marine & General Insurance Company ("NYMAGIC") and Federal Insurance Company ("Federal") (Doc. #402 ) is **DENIED**.

　　**IT IS FURTHER ORDERED** Settoon's Motion to Strike NYMAGIC's Supplemental and Amending Answer to Interrogatory No. 2 (Doc. #402) is **DENIED**.

　　**IT IS FURTHER ORDERED** Settoon's Motion to Strike Federal's Supplemental and Amending Answer to Interrogatory No. 2 (Doc. #402) is **DENIED**.

　　**IT IS FURTHER ORDERED** that State National Insurance Company's ("SNIC") Motion for Partial Summary Judgment Regarding Pollution Coverage (Doc. #489) is **GRANTED AS UNOPPOSED** as to the marine general liability policy and the hull and machinery/protection and indemnity policy, and **DENIED** as to the first layer bumbershoot policy.

**IT IS FURTHER ORDERED** that Settoon's Cross-Motion for Partial Summary Judgment Against SNIC Regarding Pollution Coverage (Doc. #495) is **GRANTED**.

**IT IS FURTHER ORDERED** that NYMAGIC's and Federal's Motion for Summary Judgment Regarding Pollution Coverage (Doc. #392) is **GRANTED**, and Settoon's claims against NYMAGIC and Federal are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Settoon's Cross Motion for Partial Summary Judgment Against NYMAGIC and Federal Regarding Pollution Coverage (Doc. #411) is **DENIED**.

**IT IS FURTHER ORDERED** that St. Paul Fire and Marine Insurance Company's ("St. Paul") Motion for Summary Judgment Regarding Pollution Coverage (Doc. #486) is **GRANTED**, and Settoon's claims against St. Paul are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Settoon's Cross-Motion for Partial Summary Judgment Against St. Paul Regarding Pollution Coverage (Doc. #496) is **DENIED**.

## BACKGROUND

On January 20, 2007, the M/V CATHY M. SETTOON, a vessel owned and operated by Settoon, while pushing a barge, struck a well owned and operated by ExPert Oil and Gas, LLC ("ExPert"), in Bayou Perot in Jefferson Parish, Louisiana.  The allision caused extensive damage to the wellhead and resulted in an uncontrolled spray of crude oil into the bayou.

The principal issues in these motions involve the applicability of the pollution exclusions in endorsements to Settoon's several marine insurance policies, and the activation of the sudden and accidental pollution buyback provision in the endorsements.

2

Following the allision, the captain of the M/V CATHY M. SETTOON did not report the event to Settoon or the United States Coast Guard.

On January 21, 2007, another Settoon vessel, the M/V CHERYL SETTOON, passed the allision site.  The captain of that vessel, Robert Hartman, reported the oil spill to the Court Guard and Settoon's Safety Manager, Nick Cater.  Thereafter, the Coast Guard conducted an investigation to determine which vessel struck ExPert's wellhead.  The captain of the M/V CATHY M. SETTOON initially denied involvement in the event.   However, on February 23, 2007,  34 days after the event, he admitted his involvement when the Coast Guard confronted him with a reconstruction of the allision from the M/V CATHY M. SETTOON's tracking system.

At the time of the event, Settoon had various marine insurance policies provided by SNIC, NYMAGIC, Federal, and St. Paul.   The SNIC policies included a marine general liability policy, hull and machinery/protection and indemnity policy, and a first layer bumbershoot policy that provided $4,000,000 of excess insurance coverage over the underlying policies. NYMAGIC insured 100% of the second bumbershoot layer of insurance providing $5,000,000 excess insurance over the SNIC first layer bumbershoot excess marine insurance policy.  NYMAGIC, Federal, and St. Paul all subscribed to the third layer bumbershoot policy which provided $40,000,000 aggregate policy limit of excess insurance over the first and second layer bumbershoot excess insurance policies. Settoon notified the insurers in writing of the event on February 26, 2007.

SNIC, as the hull and machinery/protection and indemnity insurer, appointed counsel to defend Settoon. On March 12, 2007, the appointed counsel, along with counsel retained by Settoon, filed a Complaint for Exoneration from or Limitation of Liability, pursuant to the Limitation of

3

Liability Act, 46 U.S.C. §181, et seq., in the United States District Court for the Eastern District of Louisiana, Civil Action Number 07-1263.  ExPert, St. Paul Surplus Lines Insurance Company, and the United States of America filed claims in the limitation action.

On April 12, 2007, SNIC issued a reservation of rights letter to Settoon outlining its coverage defenses. On April 25, 2007, St. Paul issued a reservation of rights letter to Settoon.   Then, on May 4, 2007, NYMAGIC and Federal issued  reservation of rights letters to Settoon.  St. Paul joined in NYMAGIC's May 4, 2007, reservation or rights letter.

On August 21, 2007, SNIC, NYMAGIC, and Federal filed a Declaratory Judgment Action in the United States District Court for the Eastern District of Louisiana, Civil Action Number 07-4230, seeking a judicial declaration that the marine insurance policies that they provided to Settoon do not cover Settoon's losses or those of any third party relating to the January 20, 2007, oil spill. (Doc. #1).

## A.  NYMAGIC, Federal, and St. Paul

The excess marine insurance policies issued to Settoon by NYMAGIC, Federal, and St. Paul exclude pollution liability from coverage. The policies provide that they do not apply "[t]o any claim directly or indirectly in consequence of the actual or potential discharge, dispersal, release, or escape of . . . petroleum produces or derivatives, . . . into or upon . . . any watercourse or body of water." Also, Endorsement No. 2 of the policies provides that "[n]otwithstanding anything to the contrary contained in this policy, . . . this policy shall not apply to . . . [l]iability for . . . loss of, damage to, or loss of use of property directly or indirectly caused by or arising out of seepage into or onto

4

and/or pollution and/or contamination of water . . . irrespective of the cause of the seepage and/or pollution and/or contamination, or whenever occurring."

Endorsement No. 8 of the excess marine insurance policies that NYMAGIC, Federal, and St. Paul issued to Settoon also contain an absolute pollution exclusion, with a sudden and accidental pollution liability buyback option.  Specifically, Endorsement No. 8 provides in pertinent part:

I.   ABSOLUTE POLLUTION EXCLUSION:

    (A)    In consideration of the premium charged, it is hereby agreed that this policy shall not apply to any liability for . . . "property damage"[1] . . . arising out of the actual, alleged or threatened "release" of "pollutants" into or upon . . . any watercourse, water supply, reservoir or body of water.

            It is further agreed that the intent and effect of this exclusion is to delete from any and all coverage's (sic) afforded by the policy any "occurrence"[2], claim, suit, cause of action, liability, settlement, judgment, defense costs or expenses in any way arising out of such "release" whether or not such "release" is sudden or gradual and whether or not such "release" is expected, intended, foreseeable, fortuitous, accidental, or inevitable, and wherever such "release" occurs.

---

[1] The policy defined "property damage" as:

    loss of or direct damage to or destruction of tangible property (other than property owned or occupied by the Named Assured), including all resultant loss of use of such tangible property.

[2] The policy defined "occurrence" as:

    an event or a continuous or repeated exposure to conditions which unintentionally causes "personal injury" or "property damage" during the policy period.  All such "personal injury" or "property damage" resulting from a common cause or from exposure to substantially the same conditions shall be deemed to result from one "occurrence."

5

(B)   <u>Definitions</u>

    (1) "Pollutants" means any . . . liquid, gaseous . . . contaminant, . . . The term "pollutants" shall include products, which have escaped or have been released from tanks, drums, pipelines, hoses, or any other conveyance or container and as a consequence pose a threat to health, or the environment.

    (2) "Release" means discharge, dispersal, seepage, release, or escape of "pollutants."

II.   <u>SUDDEN AND ACCIDENTAL BUYBACK</u>

(A)   It is hereby agreed that the above Absolute Exclusion shall not apply provided that the Named Assured establishes that all of the following conditions have been met:

    (1) The occurrence is covered by valid and collectible underlying insurance and listed in the Schedule of Underlying Insurance for the full limit shown therein.

    (2) The occurrence was accidental and was neither expected nor intended by the assured. An occurrence shall not be considered unintended or unexpected unless caused by some intervening event neither foreseeable nor intended by the assured.

    (3) The occurrence can be identified as commencing at a specific time and date during the term of this policy.

    (4) The occurrence became known to the assured within 72 hours after its commencement.

    (5) The occurrence was reported in writing to these underwriters within 30 days after having become known to the assured.

    (6) The occurrence did not result from the assured's intentional or willful violation of any government statute, rule, or regulation.

*     *     *

**ALL OTHER TERMS AND CONDITIONS REMAINING UNCHANGED**

**B. SNIC**

The excess marine insurance policy issued by SNIC to Settoon excludes from coverage any liability for, or any loss, damage, injury or expense caused by pollution liability, which is defined, in pertinent part, as "any liability or expense directly or indirectly in consequence of the actual or potential discharge, dispersal, release, or escape of . . . petroleum products or derivatives, . . . into or upon . . . any watercourse or body of water."  The policy also contains a pollution liability endorsement, which provides that the pollution liability exclusion shall not apply if the insured establishes that all of the following conditions have been met:

A) The discharge, dispersal, release or escape was accidental and was neither expected nor intended by the Insured; a discharge, dispersal, release or escape shall not be considered unintended or unexpected unless caused by some intervening event neither foreseeable nor intended by the Insured.

B) The discharge, dispersal, release or escapee (sic) can be identified as commencing at a specific time and date during the term of this policy.

C) The discharge, dispersal, release or escape became known to the Insured within 72 hours after its commencement.

D) The discharge, dispersal, release or escape was reported in writing to these underwriters with 21 days after having become known to the Insured.

E) The discharge, dispersal, release or escape did not result from the Insured's intentional and willful violation of any government statute, rule or regulation.

The insurers and Settoon have filed cross-motions for summary judgment regarding the applicability of the pollution exclusions and the sudden and accidental pollution buyback endorsements.  Also, Settoon has filed motions to strike against NYMAGIC and Federal.

## ANALYSIS

### A.  Motions to Strike (Doc. #402)

Settoon filed a motion to strike: (1) paragraph 2(c) on page 10 of the Complaint for Declaratory Judgment as it relates to NYMAGIC and Federal; (2) NYMAGIC's Supplemental and Amending Answer to Interrogatory No. 2; and (3) Federal's Supplemental and Amending Answer to Interrogatory No. 2.

Paragraph 2(c) on page 10 of the Complaint for Declaratory Judgment alleges that the insurers were prejudiced by untimely notice of the loss, which notice was more than one month after the occurrence.

In Interrogatory No. 2, Settoon asked NYMAGIC and Federal to specify the conditions precedent of Endorsement No. 8 with which they contend Settoon did not comply.  In their original responses to Interrogatory No. 2, NYMAGIC and Federal stated that Settoon failed to comply with 8(II)(A)(4) (assured's knowledge of the occurrence within 72 hours of its commencement) and 8(II)(A)(6) (occurrence did not result from the assured's intentional or willful violation of any government statute, rule, or regulation).  NYMAGIC and Federal subsequently amended their answers to Interrogatory No. 2 to reflect that they contend that Settoon also failed to comply with 8(II)(A)(1) (coverage for the occurrence by valid and collectible underlying insurance) and 8(II)(A)(5) (assured must report the occurrence to the insurer within 30 days after having become known to the assured).

Settoon argues that NYMAGIC's corporate representative testified that NYMAGIC's original answer to Interrogatory No. 2, which stated that it was relying on Endorsement No.

8

8(II)(A)(4) and  8(II)(A)(6) to deny coverage was correct, and that NYMAGIC cannot now claim

that it is also relying on 8(II)(A)(1) and  8(II)(A)(5).  Settoon argues that it is prejudiced by late

notice of this defense to coverage.

NYMAGIC's and Federal's supplemental discovery responses which state that they are

relying on 8(II)(A)(1) and  8(II)(A)(5) to deny coverage are not a surprise to Settoon, but rather are

a clarification of the position NYMAGIC and Federal have maintained throughout the litigation.

In the Complaint, NYMAGIC and Federal allege that they were prejudiced by Settoon's untimely

notice.  Their reservation of rights letters cite untimely notice as a basis for denying coverage.

Further, numerous pleadings in the litigation reference the 30-day notice provision found in

8(II)(A)(5).  The corporate representative testified that the reservation of rights letter included the

30-day notice provision found in 8(II)(A)(5) as a basis to deny coverage, and that the discovery

responses were correct.  NYMAGIC's and Federal's supplemental discovery responses do not

change the corporate representative's  testimony.  Instead, the supplemental responses clarify the

insurers' interrogatory responses.  Therefore, Settoon's motions to strike are DENIED.

**B.  Cross Motions for Summary Judgment (Docs. #392, 411, 486, 489, 495 & 496)**

    **1.  Summary Judgment Standard**

Summary judgment is proper when, viewing the evidence in the light most favorable to the

non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to

judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir.

1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that

there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the

existence of a genuine issue for trial.  Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).  If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case.  Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

## 2.  Insurance Policy Interpretation

The interpretation of an insurance contract and its exclusions is a question of law. See Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 197 F.3d 742,746 (5th Cir. 2000). Under Louisiana law, the general rules of contract interpretation apply to determine the common intent of the parties to the contract. See Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La.1994). The intent of the parties as reflected in the policy determines the extent of the coverage. Id. The words of an insurance policy are given their "general, ordinary, plain, and proper meaning ... unless [they] have acquired a technical meaning." Id.

"An insurer, like other individuals, is entitled to limit its liability and to impose and enforce reasonable conditions upon the policy obligations it contractually assumes" Zeitoun  v. Orleans Parish  Sch.  Bd., 33 So.3d 361, 365 (La. Ct. App. 2010) (citing Louisiana  Ins.  Guar.  Ass'n  v. Interstate Firs & Cas. Co., 630 So.2d 759, 763 (La. 1994)).   An exclusion from coverage must be clear and unmistakable.  See Roger v. Estate of Moulton, 513 So.2d 1126, 1130 (La. 1987).  When the language is clear and unambiguous, it must be enforced as written.  See Reynolds v. Select Props.

Ltd., 634 So.2d 1180, 1183 (La.1994). "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046. "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Amoco Prod. Co. v. Tx. Meridian Res. Exploration Inc., 180 F.3d 664, 668-69 (5th Cir. 1999) (quoting Tx. E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998)) (internal quotation marks omitted).   If there is an ambiguity in the policy of insurance, the ambiguous provision is construed against the insurer because it is the party who furnished the text. LA. CIV. CODE ANN. art. 2056.  Exclusionary clauses are strictly construed against the insurer. See Borden, Inc. v. Howard Trucking, 454 So.2d 1081 (La. 1983).  If the language of the exclusion is subject to more than one reasonable interpretation, the interpretation that favors coverage is applied. See Reynolds, 634 So.2d at 1183.

An insurer may change or amend the policy's coverage in an endorsement attached to the policy as long as the provisions and/or endorsements do not conflict with statutory law or public policy. Zeitoun, 33 So.3d at 364(citing Louisiana Ins. Guar. Ass'n, 630 So.2d at 763).   An endorsement that is attached to a policy are parts of the same contract and are construed together. Id. (citing Mattingly v. Sportsline, Inc., 720 So.2d 1227, 1230 (La. Ct. App. 1998)).  If there is a conflict between the endorsement and the general policy provisions, the endorsement prevails. Id. (citing Chicago Prop. Interests, L.L.C. v. Broussard, 8 So.3d 42, 49 (La. Ct. App. 2009)).

"When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms." Doerr v. Mobil Oil Corp., 774

11

So.2d 119, 124 (La. 2000).  However, the insurer bears the burden of proving the applicability of an

exclusion from coverage. Id.; see also Turnstall v. Stierwald, 809 So.2d 916, 921 (La. 2002).  Once

the insurer proves the applicability of an exclusion from coverage, the burden of proof shifts back

to the insured to prove that his claim comes within an exception to the exclusion. See Vidrine v.

LaFleur, 979 So.2d 609 (La. Ct. App. 2008).

### 3. SNIC's Motion for Summary Judgment against Settoon Regarding Pollution Coverage and Settoon's Motion for Summary Judgment Against SNIC (Docs. # 489, 495) - Delivery of the Policy

On November 8, 2007, WFT, Inc. ("WFT"), SNIC's managing general agent, emailed

Settoon's insurance agent, the Marcello Agency, Inc. (the "Marcello Agency"), a binder for the first

layer bumbershoot excess insurance coverage.  The binder stated that the insurance policy was

effective from November 2, 2006, to November 2, 2007, and provided $4,000,000 of excess

insurance coverage per occurrence.  It listed the underlying insurance policies, and contained a

"SCHEDULE OF ENDORSEMENT/FORMS" that indicated that there was a "Pollution Liability"

endorsement.  Under "Conditions," the binder stated "Warranted copies of all underlying policies

scheduled in item 5, received within 60 days of attachment.  All coverages scheduled to remain in

force for the entire term . . . .".

On December 13, 2006, Katie Oldham of WFT emailed Gia Morris at the Marcello Agency

stating that the following items were needed to issue the policy: (1) the original signed application;

(2) the original signed terrorism risk insurance act ("TRIA") form; (3) copies of all underlying

policies; and, (4) the premium payment.  On December 28, 2006, Oldham emailed Morris and stated

that the premium payment had been received, but that a copy of the signed application and copies of

all underlying policies not carried by WFT were needed to issue the policy.  On January 10, 2007, Oldham again emailed Morris inquiring about the status of the original application and copies of the underlying policies.  In response, Morris sent Oldham the policy application, and stated that she carbon copied Melanie Tastet at the Marcello Agency who handles the policy processing, and that Tastet could forward the policies to Oldham when she received them.  On January 23, 2007, Oldham against emailed Morris to remind her that WFT needed copies of all underlying policies to issue the SNIC first layer bumbershoot excess insurance policy. On February 7, 2007, Oldham inquired of the status of copies of the underlying policies, stated that they are the final items needed to issue the policy, and set a due date of February 21, 2007.  Morris replied that she carbon copied Tastet, who handles policy processing.  Tastet replied on February 9, 2007,  and stated that she would forward copies of the policies that the Marcello Agency handled to Oldham when she receives them.  Tastet informed Oldham that the Marcello Agency did not handle the business auto liability policy, the employer's liability policy, or the maritime employer's liability policy.

A copy of the SNIC first layer bumbershoot excess insurance policy was delivered to Settoon on March 2, 2007, after the January 20, 2007, allision.

Settoon argues that pursuant to Louisiana Revised Statutes §22:873,  SNIC cannot rely on the pollution exclusion included in the first layer bumbershoot excess insurance policy because the policy was not delivered to Settoon before the allision. Settoon argues that it was not aware of the conditions in the pollution buyback endorsement because it did not have a copy of the policy before the allision, and did not know precisely what was required to obtain coverage for sudden and accidental pollution.

13

SNIC argues that the delivery of the binder should be sufficient.  Also, it argues that Settoon knew generally what the conditions in the pollution buyback endorsement were because these types of endorsements are common in marine insurance policies, which Settoon has had in the past.  SNIC also argues that the delivery of the policy was contingent upon Settoon's providing copies of the underlying policies, and that delivery was delayed by Settoon's failure to do so.

The applicable version of La. Rev. Stat. § 22:873[3] provides, in pertinent part:

> A. Subject to the insurer's requirements as to payment of premium, every policy shall be delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance.

The purpose of the statute is to require that the insured be informed of the policy's contents. Louisiana Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London, 616 So.2d 1250, 1252 (La. 1993).  "Notice of any exclusionary provisions is essential because the insured will otherwise assume the desired coverage exists." Id.  Thus, "[i]nsurance policy exclusions are not valid unless clearly communicated to the insured." Id.

The binder in this case did not clearly communicate that pollution coverage was excluded, or what conditions the insured was required to meet in order to implement the buyback endorsement to gain pollution coverage for sudden and accidental pollution.  The only mention of pollution coverage in the binder are the words "Pollution Liability" listed in the "SCHEDULE OF ENDORSEMENT/FORMS."  This is insufficient to place the insured on notice of the exclusions included in the policy.  Further, under La. Rev. Stat. § 22:873, the only condition an insurer can

---

[3] On June 30, 2011, La. Rev. Stat. § 22:873 was amended to add that delivery may be made by the United States Postal Service, personal delivery, private courier, or by electronic mail.

place on the delivery of the policy is the payment of the premium.  On December 28, 2006, WFT acknowledged that Settoon had paid the premium for the SNIC first layer bumbershoot excess insurance policy.  However, the policy was not issued until March 2, 2007, after the oil spill. Therefore, at the time of the allision, Settoon could not have known of the exact nature of the pollution exclusion and buyback provisions of the SNIC first layer bumbershoot excess insurance policy.  Thus, Settoon's motion for summary judgment against SNIC is GRANTED, and SNIC's motion for summary judgment is DENIED as to the first layer bumbershoot excess insurance policy.

4.  **NYMAGIC's, Federal's, and St. Paul Motions for Summary Judgment Regarding Pollution Coverage and Settoon's Motions for Summary Judgment against NYMAGIC, Federal, and St. Paul Regarding Pollution Coverage (Docs. #392, 411, 486 & 496)**

NYMAGIC, Federal, and St. Paul argue that they are entitled to summary judgment because the their policies clearly exclude pollution coverage, and that the sudden and accidental pollution buyback provision found in Endorsement No. 8 has not been activated.

a.  **Applicability of the Pollution Exclusion**

The NYMAGIC, Federal, and St. Paul excess marine insurance policies specifically exclude coverage for pollution liability in three separate clauses.  The absolute pollution exclusion in Endorsement No. 8 provides that the policies do not provide coverage for property damage arising out of the release of pollutants into any body of water.  The purpose of Endorsement No. 8, in part, is to "delete from any and all coverage's (sic) afforded by the policy any 'occurrence' claim, suit, cause of action, liability, settlement, judgment, defense costs or expenses" in any way arising out of a release of pollutants into a body of water.

15

In <u>Doerr</u>, the Supreme Court of Louisiana examined the history of pollution exclusion provisions in insurance policies.  After discussing the absurd consequences that could result from an overly broad reading of a pollution exclusion, the court noted that the purpose of the pollution exclusion has always been to exclude coverage for environmental pollution, and that there is no evidence "that it was ever intended to apply to anyone other than an active polluter of the environment."  <u>Id.</u>  The court explained that the applicability of a pollution exclusion turns on whether the insured is a "polluter" within the meaning of the exclusion; whether the injury causing substances is a "pollutant" within the meaning of the exclusion; and, whether there was a discharged, dispersal, seepage, migration, release, or escape of a pollutant by the insured within the meaning of the policy <u>Id.</u> at 135. The Supreme Court of Louisiana explained that in analyzing these questions, courts must consider:

> First, the determination of whether an insured is a "polluter" is a fact-based conclusion that should encompass consideration of a wide variety of factors. In making this determination, the trier of fact should consider the nature of the insured's business, whether that type of business presents a risk of pollution, whether the insured has a separate policy covering the disputed claim, whether the insured should have known from a read of the exclusion that a separate policy covering pollution damages would be necessary for the insured's business, who the insurer typically insures, any other claims made under the policy, and any other factor the trier of fact deems relevant to this conclusion.

> Second, the determination of whether the injury-causing substance is a "pollutant" is also a fact-based conclusion that should encompass a wide variety of factors. As pointed out above, there are a variety of substances that could fall within the broad definition of irritants and contaminants as provided in this policy. For example, under pollution exclusions similar to the one at issue here, courts have found "pollutant" to include everything from asbestos, carbon monoxide, gasoline, lead paint, and some pesticides; on the other hand, some courts have found that "pollutants" do not include muriatic acid, styrene resins, and other forms of pesticide. Consequently, when making this determination, the trier of fact should

16

consider the nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor the trier of fact deems relevant to that conclusion.

Finally, the determination of whether there was "discharge, dispersal, seepage, migration, release or escape" is likewise a fact-based conclusion that must result after a consideration of all relevant circumstances. Specifically, the trier of fact should consider whether the pollutant was intentionally or negligently discharged, the amount of the injury-causing substance discharged, whether the actions of the alleged polluter were active or passive, and any other factor the trier of fact deems relevant. These factual conclusions should be made to assist a court in determining whether the total pollution exclusion in any particular case will exclude coverage for a claim.

Id. at 135-36 (internal citations omitted).

### i.  Polluter

The nature of Settoon's business is towing barges that transport oil, oil derivatives, saltwater produced by oil or gas wells, or produced water over the intracoastal waterways in areas that contain many oil and gas wellheads and submerged pipelines.  This type of business presents a risk of pollution because the oil or oil byproducts could leak from the barges, or Settoon's vessels or tows could strike a wellhead or pipeline during transportation causing an oil leak.

Further, Settoon had a separate pollution insurance policy issued by E.P.G., LLC which provided $5,000,000 of coverage for each occurrence.  The policy covered Settoon's vessels and barges and listed crude, oil, chemicals, and saltwater as potential pollutants.  Further, the NYMAGIC, Federal, and St. Paul excess marine insurance policies specifically exclude from coverage pollution arising out of the actual, alleged, or threatened release of pollution into any body

of water.  The release of oil or an oil byproduct into a body of water is a risk of Settoon's business.

Thus, a reading of the pollution exclusion in the NYMAGIC, Federal, and St. Paul excess marine

insurance policies should have put Settoon on notice that it would need a separate pollution policy.

These facts demonstrate that Settoon is a polluter. See Pro-Boll Chem. & Fertilizer Co., Inc. v.

United States Fire & Guar. Co., 2004 WL 3495324 (W.D. La. 11/15/04) (holding that, although it

did not cause the pollution incident at issue, Pro-Boll was a "polluter" under Doerr because the

nature of its business clearly presented a risk of pollution, and it clearly knew that it needed a

separate pollution insurance policy); Grefer v. Travelers Ins. Co., 919 So.2d 758, 771 (La. Ct. App.

2005) (holding that ITCO was a polluter because its business of cleaning oil drill pipes presented

a risk of pollution, and it knew it needed to purchase a separate pollution insurance policy)).

### ii.  Pollutant

The definition of pollutant in the exclusion found in the NYMAGIC, Federal, and St. Paul

excess marine insurance policies includes liquid or gaseous contaminants that have escaped or been

released from pipelines or other conveyances and pose a threat to the environment.  When crude oil

is released into a body of water it is a liquid contaminant that poses a threat to the environment.

Therefore, the crude oil that was released from ExPert's wellhead was a pollutant.

### iii.  Release of a Pollutant by the Insured

Further, there was a release of a pollutant caused by the insured when a vessel owned and

operated by Settoon allided with ExPert's wellhead resulting in the release of crude oil into a body

of water.  The allision is the event from which Settoon's liability attached for the pollution for which it seeks insurance coverage.

Thus, NYMAGIC, Federal, and St. Paul have established that the pollution exclusion applies.  Property damage, or other liability, or expenses that result from Settoon's release of a crude oil into a body of water are excluded under the pollution exclusion.

### b.   The Pollution Buyback

Although NYMAGIC, Federal, and St. Paul have established that the excess marine insurance policies they issued to Settoon contain an exclusion from coverage for the January 20, 2007, oil spill that resulted from the allision of the M/V CATHY M. SETTOON with ExPert's wellhead, the policies include a sudden and accidental pollution coverage buyback provision.  Under that provision, coverage for occurrences that are excluded under the pollution exclusion can be reinstated if certain conditions are met.  The pollution coverage buyback is an exception to the absolute pollution exclusion because it permits the insured to establish coverage that does not otherwise exist under the policies.  Settoon bears the burden of proving that its claim comes within the pollution buyback.  Doerr, 774 So.2d at 124.

The sudden and accidental pollution coverage buyback provision contained in Endorsement No. 8 provides that the pollution exclusion shall not apply, provided that Settoon establishes that all of the conditions listed to obtain pollution coverage are met.   Two of the conditions are: (1) that Settoon has notice of the occurrence within 72 hours of its commencement; and , (2) that Settoon report the occurrence to the insurers in writing within 30 days of when Settoon becomes aware of

19

it.  NYMAGIC, Federal, and St. Paul argue that Settoon cannot meet its burden of showing that it

meet these conditions to activate the sudden and accidental pollution coverage buyback provision.

### i. Settoon's Knowledge of the Pollution Event within 72 Hours of Its Commencement

One of the conditions to obtaining pollution coverage included in Endorsement No. 8 is that

"[t]he occurrence became known to [Settoon] within 72 hours after its commencement."  The

policies define "occurrence," in pertinent part, as "an *event* . . . which unintentionally causes . . .

"property damage" during the policy period." (Emphasis added).

Settoon did not fulfill the 72 hour knowledge condition to activate the sudden and accidental

pollution coverage buyback provision.  In his deposition, Hartman, the captain of the M/V CHERYL

SETTOON, testified that on January 21, 2007, he noticed an orange streak in the water on the port

side of the vessel, turned the spotlight to the starboard side, and saw oil spewing about 20 to 25 feet

in the air from the well.    Hartman testified that he told another boat captain in the area that it

looked like someone hit the well.  Hartman informed the Coast Guard and Settoon's management

about the oil spill.

NYMAGIC propounded discovery requests on Settoon in which it asked Settoon to "admit

that incident of January 20, 2007 did not become known to [Settoon] until February 23, 2007.

Settoon responded: "Denied.  Settoon became aware that the incident had happened on January 21,

2007, but it was told that it did not involve one of Settoon's vessels."

This evidence demonstrates that Settoon had knowledge of the oil spill on January 21, 2007.

However, Settoon did not have knowledge of the *event* that caused the oil spill within 72 hours of

its occurrence. Indeed, Settoon did not have knowledge of the event that caused the oil pollution, the M/V CATHY SETTOON's striking ExPert's wellhead, until February 23, 2007.  Therefore, Settoon has met not this condition to activate the sudden and accidental pollution coverage buyback provision.

Further, if the captain of the M/V CATHY SETTOON's knowledge that his vessel hit ExPert's wellhead is imputed to the company, Settoon would have become aware of the occurrence on January 20, 2007.  Settoon did not provide written notice of the occurrence to NYMAGIC, Federal, and St. Paul until February 26, 2007,  more than 30 days later. Therefore, if the M/V CATHY SETTOON's captain's knowledge of the occurrence is imputed to the company, Settoon failed to meet the sudden and accidental pollution buyback provision's condition that Settoon report the occurrence to its insurers within 30 days after its becoming aware of it.

### ii.  Impossibility of Performance

Settoon argues that the doctrine of impossibility of performance relieves it of its obligations to know about the event that caused the oil spill within 72 hours of its commencement and to report the occurrence to the insurers in writing within 30 days of Settoon's discovering the occurrence because it could not have known that its vessel was involved until the M/V CATHY M. SETTOON's captain confessed his involvement.

Impossibility of performance is a defense that excuses an obligor from performance of an obligation when the failure to perform is caused by a fortuitous event that makes performance impossible. LA. CIV. CODE art. 1873.  A fortuitous event is "one that, at the time the contract was

made, could not have been reasonably foreseen." Id. at 1875. "Impossibility of performance is, thus, one of the manners in which obligations are extinguished, and is also an excuse that relieves the obligor from the consequences of his failure to perform." 5 LA. CIV. L. TREATISE, LAW OF OBLIGATIONS § 16.1 (2001).

The doctrine of impossibility of performance does not apply to the 72 hour knowledge requirement in Endorsement No. 8 because the reporting requirement was not an extinguishable obligation to perform, rather it was one of the events that triggered coverage for sudden and accidental pollution. The NYMAGIC, Federal, and St. Paul excess marine insurance policies did not provide pollution coverage. The sudden and accidental pollution buyback provision permitted Settoon to obtain such coverage by complying with certain conditions. Therefore, the doctrine of impossibility of performance does not excuse Settoon's failure to comply with the 72 hour knowledge provision of Endorsement No. 8 in order to trigger the sudden and accidental pollution buyback provision of the policies.

### iii. Waiver

Settoon argues that NYMAGIC, Federal, and St. Paul waived their rights to raise coverage defenses because they did not timely issue reservation of rights letters and improperly retained information from Settoon's representatives before denying coverage. Specifically, Settoon contends that when it notified SNIC's claims representative, Millard Goutierez, of the occurrence on February 26, 2007, Goutierez knew that there were coverage defenses and discussed them with Paul Smith, who worked with NYMAGIC, Federal, and St. Paul. Goutierez appointed coverage counsel and separate counsel to represent Settoon. SNIC's coverage counsel and Settoon's counsel

22

communicated with each other and Goutierez, and Goutierez passed information along to Smith. On April 12, 2007, SNIC issued a reservation of rights letter to Settoon. On April 25, 2007, St. Paul issued a reservation of rights letter to Settoon.   Then, on May 4, 2007, NYMAGIC and Federal issued reservation of rights letters to Settoon, and St. Paul joined in NYMAGIC's May 4, 2007, reservation or rights letter.  Settoon contends that the reservation of rights letters were issued after the insurers improperly received information from Settoon upon which they relied to deny coverage.

In Steptore v. Masco Constr. Co., Inc., 643 So.2d 1213, 1216 (La. 1994), the Supreme Court of Louisiana summarized the law of waiver in Louisiana:

> Waiver is generally understood to be the intentional relinquishment of a known right, power, or privilege.  Waiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquishment it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.  A waiver may apply to any provision of an insurance contract, even through this may have the effect of bringing within coverage risks originally excluded or not covered.

(citations omitted).  The court also stated that waiver principles apply to "uphold the prohibition against conflicts of interest between the insurer and the insured which could potentially affect legal representation in order to reinforce the role of the lawyer as the loyal advocate of the client's interests." Id. (citations omitted).  The Steptore court applying these principles held that "when an insurer, under the insurance policy, assumes or continues the insured's defense without obtaining a non-waiver agreement to reserve its coverage defense, the insurer waives such policy defense." Id. (citations omitted).

Here, NYMAGIC, Federal, and St. Paul provided excess marine insurance policies to Settoon. They did not have a duty under their policies to defend Settoon, nor did they provide a defense for Settoon. A representative of the excess insurers discussed the matter with SNIC's claims representative. They were not actively involved in Settoon's defense, and did not demonstrate an actual intent to relinquishment coverage defenses or act so inconsistently with the intent to enforce their right as to induce a reasonable belief that the rights were relinquished. Therefore, <u>Steptore</u> is inapplicable, and NYMAGIC, Federal, and St. Paul did not waive their rights to present coverage defenses by failing to reserve their rights before providing a defense to Settoon.

Therefore, NYMAGIC's, Federal's, and St. Paul's excess marine insurance policies do not provide pollution coverage to Settoon, and their motions for summary judgment are GRANTED. Settoon's cross-motions for summary judgment against NYMAGIC, Federal, and St. Paul are DENIED.

## CONCLUSION

**IT IS HEREBY ORDERED** that Settoon's Motion to Strike Paragraph 2(c) on Page 10 of the Complaint for Declaratory Judgment as it Relates to NYMAGIC and Federal (Doc. #402 ) is **DENIED**.

**IT IS FURTHER ORDERED** Settoon's Motion to Strike NYMAGIC's Supplemental and Amending Answer to Interrogatory No. 2 (Doc. #402) is **DENIED**.

**IT IS FURTHER ORDERED** Settoon's Motion to Strike Federal's Supplemental and Amending Answer to Interrogatory No. 2 (Doc. #402) is **DENIED**.

24

**IT IS FURTHER ORDERED** that SNIC's Motion for Partial Summary Judgment Regarding Pollution Coverage (Doc. #489) is **GRANTED AS UNOPPOSED** as to the marine general liability policy and the hull and machinery/protection and indemnity policy, and **DENIED** as to the first layer bumbershoot policy.

**IT IS FURTHER ORDERED** that Settoon's Cross-Motion for Partial Summary Judgment Against SNIC Regarding Pollution Coverage (Doc. #495) is **GRANTED**.

**IT IS FURTHER ORDERED** that NYMAGIC's and Federal's Motion for Summary Judgment Regarding Pollution Coverage (Doc. #392) is **GRANTED**, and Settoon's claims against NYMAGIC and Federal are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Settoon's Cross Motion for Partial Summary Judgment Against NYMAGIC and Federal Regarding Pollution Coverage (Doc. #411) is **DENIED**.

**IT IS FURTHER ORDERED** that St. Paul's Motion for Summary Judgment Regarding Pollution Coverage (Doc. #486) is **GRANTED**, and Settoon's claims against St. Paul are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Settoon's Cross-Motion for Partial Summary Judgment Against St. Paul Regarding Pollution Coverage (Doc. #496) is **DENIED**.

New Orleans, Louisiana, this  23rd  day of September, 2011.


**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**