UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| STATE NATIONAL INSURANCE COMPANY, ET AL. | CIVIL ACTION |
| VERSUS | NO: 07-1263 C/W 07-4230 |
| SETTOON TOWING, LLC, ET AL. | SECTION: "S" (1) |

ORDER AND REASONS

**IT IS HEREBY ORDERED** that New York Marine & General Insurance Company's Motion for Summary Judgment (Doc. #648) is **GRANTED** as to Settoon Towing, L.L.C.'s claims for (1) cost of replacing ExPert's well in the amount of $2,105,831.98 plus interest; (2) plugging and abandonment expenses in the amount of $76,641.66 plus interest; (3) loss of product in the amount of $74,400 plus interest; (4) deferral of production in the amount of $362,500 plus interest; (5) interest on money it borrowed to fund the settlements; and, (7) bad faith damages on those claims, and such claims are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** as to Setton's claim for attorneys' fees and expenses in the limitation action, plus interest thereon and bad faith damages as to that claim.

**IT IS FURTHER ORDERED** that Settoon Towing, L.L.C.'s Motion to Strike Affidavit of R. Bryan Tilden from the Summary Judgment Record (Doc. #666) is **DENIED** as moot because the court did not rely on Tilden's affidavit in reaching its decision on NYMAGIC's motion for summary judgment.

BACKGROUND

On January 20, 2007, the M/V CATHY M. SETTOON, a vessel owned and operated by defendant, Settoon Towing, LLC, while pushing a barge, struck a well owned and operated by

ExPert Oil and Gas, LLC ("ExPert"), in Bayou Perot in Louisiana.  The allision caused extensive damage to the wellhead and resulted in an uncontrolled spray of crude oil into the bayou.

Following the allision, the captain of the M/V CATHY M. SETTOON did not report the event to Settoon or the United States Coast Guard.

On January 21, 2007, another Settoon vessel, the M/V CHERYL SETTOON, passed the allision site.  The captain of that vessel, Robert Hartman, reported the oil spill to the Coast Guard and Settoon's Safety Manager, Nick Cater.  Thereafter, the Coast Guard conducted an investigation to determine which vessel struck ExPert's wellhead.  The captain of the M/V CATHY M. SETTOON initially denied involvement in the event.   However, on February 23, 2007,  34 days after the event, when the Coast Guard confronted him with a reconstruction of the allision from the M/V CATHY M. SETTOON's tracking system, he admitted his involvement.

At the time of the event, Settoon had various marine insurance policies provided by State National Insurance Company ("SNIC"), New York Marine and General Insurance Company ("NYMAGIC"), Federal Insurance Company ("Federal'), and St. Paul Fire and Marine Insurance Company ("St. Paul").  The SNIC policies included a marine general liability policy, a hull and machinery/protection and indemnity policy, and a first layer bumbershoot policy that provided $4,000,000 of excess insurance coverage over the underlying policies.  NYMAGIC insured 100% of the second bumbershoot layer of insurance providing $5,000,000 excess insurance over the SNIC first layer bumbershoot excess marine insurance policy.  NYMAGIC, Federal, and St. Paul all subscribed to the third layer bumbershoot policy which provided $40,000,000 aggregate policy limit

of excess insurance over the first and second layer bumbershoot excess marine insurance policies. Settoon notified the insurers in writing of the event on February 26, 2007.

The insurers filed a declaratory judgment action in the United States District Court for the Eastern District of Louisiana (Civil Action No. 07-4230) seeking a ruling that they are not liable for Settoon's losses arising out of the allision.[1] The parties filed cross-motions for summary judgment regarding the insurers' liability for pollution damages, and the district court held that the umbrella insurers were not liable on the Bumbershoot 2 and 3 policies for any pollution damages because Settoon did not comply with the policies' notice requirements for pollution buyback coverage, and that SNIC was liable on the Bumbershoot 1 policy for pollution damages because it delayed in delivering the policy to Settoon in violation of Louisiana Revised Statutes § 22:873(A). Settoon and SNIC appealed, and the United States Court of Appeals for the Fifth Circuit affirmed the district court's holdings on those issues.[2]

Thereafter, SNIC settled its liability to Settoon under the Bumbershoot 1 policy by paying its $4,000,000 policy limit. Settoon allocated all of this money to pollution damages. Settoon then made a claim against NYMAGIC for the following non-pollution claims: (1) cost of replacing ExPert's well in the amount of $2,105,831.98 plus interest; (2) plugging and abandonment expenses in the amount of $76,641.66 plus interest; (3) loss of product in the amount of $74,400 plus interest; (4) deferral of production in the amount of $362,500 plus interest; (5) interest on money it borrowed

---

[1] Settoon filed a limitation of liability action in the United States District Court for the Eastern District of Louisiana (Civil Action No. 07-1263). Settoon settled the claims filed in that action by paying to the United States of America the amount of its claim for pollution clean-up and damages, and paying to ExPert and its subrogated insurers a compromise of their claims for pollution clean-up and other damages.

[2] The appellate court remanded the case to the district court for a specified calculation of prejudgment interest.

to fund the settlements; (6) attorneys' fees and expenses in the limitation action in the amount of $1,256,133.01 plus interest; and (7) bad faith damages on all of these claims.[3]

NYMAGIC filed a motion for summary judgment arguing that the Bumbershoot 2 policy does not provide coverage for Settoon's claims related to the cost of replacing the well, plugging and abandoning expenses, loss of production, deferral of production, and interest on money Settoon borrowed to fund the settlements in the limitation action, because these are excluded under Endorsement #2. NYMAGIC also argues that it is not liable for the attorneys' fees and expenses incurred by Adams and Reese in defending Settoon in the limitation action because SNIC paid the attorneys' fees and expenses of Baldwin Haspel Burke & Myers to defend Settoon in that action, and Settoon hired Adams and Reese as additional independent counsel. Alternatively, NYMAGIC argues that the "Dip Down/Non Concurrency Extension" of the Bumbershoot 2 policy excludes coverage for Settoon's claims because Settoon allocated the insurance proceeds from the SNIC Bumbershoot 1 policy to pollution damages, which are not covered by the NYMAGIC Bumbershoot 2 policy.

Settoon contends that the property damages it seeks are not excluded by the NYMAGIC Bumbershoot 2 policy. As to the attorneys' fees issue, Settoon argues that SNIC agreed to pay part Adams and Reese's attorneys' fees and expenses incurred in defending Settoon in the limitation action, and thus NYMAGIC is liable for the amounts not paid. Settoon also argues that "Dip Down/Non Concurrency Extension" is not an exclusion from coverage, but rather an extension of coverage that would require NYMAGIC to become a primary insurer to fill a coverage gap if the

---

[3] NYMAGIC lists damages paid to fishermen under the Oil Pollution Act of 1990 as a claim made to it by SNIC. SNIC does not list this claim in its opposition memorandum. Therefore, it is assumed that SNIC does not seek such recovery from NYMAGIC.

4

underlying SNIC policies are exhausted by payment of claims on other occurrences. Settoon is seeking excess coverage under the NYMAGIC Bumbershoot 2 policy for the same occurrence that depleted the underlying SNIC policies. Thus, Settoon argues that the "dip down" extension is not applicable. Further, Settoon argues that NYMAGIC waived its right to rely on the "dip down" extension by not advancing such an argument at an earlier stage of the litigation.

## ANALYSIS

**A.     Summary Judgment Standard**

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B.     Insurance Policy Interpretation**

The interpretation of an insurance contract and its exclusions is a question of law. See Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 197 F.3d 742, 746 (5th Cir. 2000).

Under Louisiana law, the general rules of contract interpretation apply to determine the common intent of the parties to the contract. See Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 763 (La.1994). The intent of the parties, as reflected in the policy, determines the extent of the coverage. Id. The words of an insurance policy are given their "general, ordinary, plain, and proper meaning ... unless [they] have acquired a technical meaning." Id.

"An insurer, like other individuals, is entitled to limit its liability and to impose and enforce reasonable conditions upon the policy obligations it contractually assumes" Zeitoun v. Orleans Parish Sch. Bd., 33 So.3d 361, 365 (La. Ct. App. 2010) (citing Louisiana Ins. Guar. Ass'n v. Interstate Firs & Cas. Co., 630 So.2d 759, 763 (La. 1994)). An exclusion from coverage must be clear and unmistakable. See Roger v. Estate of Moulton, 513 So.2d 1126, 1130 (La. 1987). When the language is clear and unambiguous, it must be enforced as written. See Reynolds v. Select Props. Ltd., 634 So.2d 1180, 1183 (La.1994). "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046. "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Amoco Prod. Co. v. Tx. Meridian Res. Exploration Inc., 180 F.3d 664, 668-69 (5th Cir. 1999) (quoting Tx. E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998)) (internal quotation marks omitted). If there is an ambiguity in the policy of insurance, the ambiguous provision is construed against the insurer because it is the party who furnished the text. LA. CIV. CODE ANN. art. 2056. Exclusionary clauses are strictly construed against the insurer. See Borden, Inc. v. Howard Trucking, 454 So.2d 1081 (La. 1983). If the language of the exclusion is

subject to more than one reasonable interpretation, the interpretation that favors coverage is applied. See Reynolds, 634 So.2d at 1183.

An insurer may change or amend the policy's coverage in an endorsement attached to the policy as long as the provisions and/or endorsements do not conflict with statutory law or public policy. Zeitoun, 33 So.3d at 364(citing Louisiana Ins. Guar. Ass'n, 630 So.2d at 763). An endorsement that is attached to a policy are parts of the same contract and are construed together. Id. (citing Mattingly v. Sportsline, Inc., 720 So.2d 1227, 1230 (La. Ct. App. 1998)). If there is a conflict between the endorsement and the general policy provisions, the endorsement prevails. Id. (citing Chicago Prop. Interests, L.L.C. v. Broussard, 8 So.3d 42, 49 (La. Ct. App. 2009)).

"When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms." Doerr v. Mobil Oil Corp., 774 So.2d 119, 124 (La. 2000). However, the insurer bears the burden of proving the applicability of an exclusion from coverage. Id.; see also Turnstall v. Stierwald, 809 So.2d 916, 921 (La. 2002). Once the insurer proves the applicability of an exclusion from coverage, the burden of proof shifts back to the insured to prove that his claim comes within an exception to the exclusion. See Vidrine v. LaFleur, 979 So.2d 609 (La. Ct. App. 2008).

## C.     The NYMAGIC Bumbershoot 2 Policy's Exclusions

NYMAGIC argues that the Bumbershoot 2 policy does not provide coverage for the Settoon's claims for the cost of replacing the well, plugging and abandoning expenses, loss of production, deferral of production, and interest on money Settoon borrowed to fund the settlements in the limitation action.   Settoon contends that the property damages it seeks are not excluded by the NYMAGIC Bumbershoot 2 policy.

Endorsement #2 of the NYMAGIC Bumbershoot 2 policy provides, in pertinent part:

## ENDORSEMENT #2

## EXCESS LIABILITY EXCLUSIONS - "OCCURRENCE" - 12.1.88

Notwithstanding anything to the contrary contained in this policy, it is hereby understood and agreed that this policy is subject to the following exclusions and that this policy shall not apply to:

\* \* \*

3. COST OF CONTROL:

   Liability for costs or expenses incurred in

   a. controlling or bringing under control any wells or holes, or
   b. extinguishing fire in or from any such wells or holes, or
   c. drilling relief wells or holes, whether or not the relief wells or holes are successful.

\* \* \*

10. UNDERGROUND RESOURCES:

    Liability for loss of or damage to sub-surface oil, gas, water, or other substance or material, or for the cost or expense of reducing to physical possession above the surface of the earth any oil, gas, water, or other substance of material; or for the cost or expense incurred or rendered necessary to prevent or minimize such loss or damage.

\* \* \*

13. INSOLVENCY:

    The insolvency, bankruptcy, receivership or any refusal or inability to pay of the Assured and/or any other insurer and/or any other Underwriter shall not operate to:

    a. Deplete the underlying limit(s) set out in the attached schedule;
    b. Increase Underwriters' liability under this Policy;
    c. Increase any Underwriters' share of liability under this Policy.

\* \* \*

Settoon's claims for the cost of replacing the well, plugging and abandoning expenses, loss of production, deferral of production, and interest on money Settoon borrowed to fund the settlements in the limitation action are clearly excluded from coverage by the above-referenced sections in Endorsement #2 of the NYMAGIC Bumbershoot 2 policy. Therefore, NYMAGIC's motion for summary judgment is GRANTED as to these claims and Settoon's claims for bad faith penalties related to these claims, and those claims are DISMISSED WITH PREJUDICE.

### D.  Settoon's Claim against NYMAGIC for Attorneys' Fees

Settoon seeks reimbursement from NYMAGIC for attorneys' fees and expenses incurred by Adams and Reese in its defense of Settoon in the limitation action in the amount of $1,256,133.01, plus interest.[4] NYMAGIC argues that it is not liable for such attorneys' fees and expenses because SNIC appointed and paid for Baldwin Haspel Burke & Mayer to defend Settoon in the limitation action pursuant to the terms of the SNIC protection and indemnity policy.[5] NYMAGIC contends that there was never a finding that Baldwin Haspel was incompetent, and that SNIC must have agreed to pay for part of Adams and Reese's fees and expenses "to keep the peace."

---

[4] It is undisputed that the NYMAGIC Bumbershoot 2 policy provides coverage for attorneys' fees and expenses by virtue of the definition of "ultimate net loss" which includes "all sums paid as . . . law costs, premiums on attachment or appeal bonds, interest, expenses for . . . lawyers, . . . and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any 'occurrence' covered hereunder. . ."

[5] The SNIC protection and indemnity policy provides, in pertinent part:

> The Underwriters shall have the option of naming the attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and third parties concerning any claim covered by this Policy, and in any event, the Underwriters shall direct the progress of such litigation or negotiations.

Settoon argues that NYMAGIC is liable for the attorneys' fees and expenses incurred by Adams and Reese in defending it in the limitation action because SNIC agreed to pay part of those fees.

**1. SNIC's Agreement to Pay Adams and Reese's Attorneys' Fees and Expenses Incurred in the Limitation Action**

In <u>Trinity Universal Ins. Co. v. Stevens Forestry Serv., Inc.</u>, 335 F.3d 353 (5th Cir. 2003), the United States Court of Appeals for the Fifth Circuit held that if an insurer provides competent counsel to the insured, the insurer is not liable to pay the attorneys' fees and expenses of the insured's independent counsel, absent an agreement to do so, regardless of the complexity of the litigation or the contribution of independent counsel.

Settoon attached the affidavit of its Executive Vice President and Chief Operating Officer, Michael C. Ellis, to its opposition memorandum (Doc. #662-5). In his affidavit, Ellis affirms that SNIC assumed Settoon's defense in the limitation action under a reservation of rights letter and appointed Baldwin Haspel to represent Settoon. He also states that Settoon, on multiple occasions, voiced concerns about Baldwin Haspel's competence and conflict of interest to SNIC, and demanded that SNIC pay for Adams and Reese to defend it in the limitation action. Further, Ellis attests that SNIC "eventually agreed to pay part of the cost for Adams and Reese to act as additional counsel in order to enhance Settoon's defense in the Limitation Action," and that Adams and Reese and Baldwin Haspel coordinated Settoon's defense. SNIC ceased paying attorneys' fees in the limitation action after the $1,000,000 per occurrence policy limit of the protection and indemnity policy was reached, and Settoon incurred an additional $1,256,133.01 in attorneys' fees and expenses in defending the limitation action.

Ellis' affidavit establishes that there are contested issues of fact regarding exactly what SNIC agreed to pay for Adams and Reese's attorneys' fees and expenses incurred in defending Settoon in the limitation action. The NYMAGIC Bumbershoot 2 policy clearly provides coverage for attorneys' fees and expenses. It provides coverage in excess of the underlying insurance policies for "ultimate net loss" caused by all protection and indemnity risks and property damage arising out of each occurrence. Because an insurer may be obligated to pay the fees and expenses of independent counsel hired by an insured if the insurer agrees to do so, NYMAGIC may be liable for some of Adams and Reese's outstanding legal fees and expenses.

**2. The NYMAGIC Bumbershoot 2 Policy's "Dip Down/Non Concurrency Extension"**

NYMAGIC argues that it is not liable for Settoon's attorneys' fees and expenses claim by virtue of the Bumbershoot 2 policy's "Dip Down/Non Concurrency Extension." Specifically, NYMAGIC contends that this clause of the insurance policy means that it does not provide coverage unless the underlying policy is exhausted by claims that would also be covered by the Bumbershoot 2 policy. Settoon allocated the proceeds from the SNIC Bumbershoot 1 policy to pollution damages. Thus, NYMAGIC argues that, because the SNIC policy was exhausted on claims not covered by the Bumbershoot 2 policy, coverage under the Bumbershoot 2 policy was not triggered for the attorneys' fees and expenses claim.

Settoon contends that the "Dip Down/Non Concurrency Extension" of the Bumbershoot 2 policy is not an exclusion, but rather an extension of coverage that would require NYMAGIC to become a primary insurer to fill a coverage gap if the underlying SNIC policies are exhausted by payment of claims on other occurrences. Settoon is seeking excess coverage under the NYMAGIC

11

Bumbershoot 2 policy for the same occurrence that depleted the underlying SNIC policies. Thus, Settoon argues that the "dip down" extension is not applicable.

The "Insuring Agreement" of the NYMAGIC Bumbershoot 2 policy provides coverage for all expenses set out in the definition of "ultimate net loss"[6] for:

> (a) All Protection and Indemnity risks of whatsoever nature including, but not limited to those covered by the underlying Protection and Indemnity Insurances. . . [and]
>
> \*     \*     \*
>
> (c) All other sums which the "Assured" shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against the "Assured" for damages of whatsoever nature, on account of "Personal Injury" or "Property Damage"[7] caused by or arising out of each "occurrence"[8] happening anywhere in the world.

---

[6] "Ultimate Net Loss" is defined as:

> the total sum which the Assured becomes obligated to pay by reason of matters set out in Insuring Agreement 1, including compromise settlements, and shall include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any "occurrence" covered hereunder, excluding, however, the salaries of the Assured's permanent employees and general office overhead and also excluding any part of such expenses for which the Assured is covered by other valid and collectible insurance.

[7] "Property Damage" means "loss of or direct damage to or destruction of tangible property (other than property owned or occupied by the Named Assured), including all resultant loss of use of such tangible property."

[8] "Occurrence" is defined as "an event or continuous or repeated exposure to conditions which unintentionally causes 'personal injury' or 'property damage' during the policy period. All such 'personal injury' or 'property damage' resulting from a common cause or from exposure to substantially the same conditions shall be deemed to result from one occurrence."

12

The limit of liability is described as $5,000,000 of "ultimate net loss" per "occurrence" in excess of the underlying limits of liability as set forth in the attached Schedule of Underlying Insurances.[9]

The plain language of the "Insuring Agreement" states that the NYMAGIC Bumbershoot 2 policy provides $5,000,000 of insurance coverage per occurrence in excess of the per occurrence limits of liability set forth in the SNIC protection and indemnity policy and the SNIC Bumbershoot 1 policy. It does not provide that the claims paid by the underlying insurers must also be covered by the NYMAGIC Bumbershoot 2 policy for the Bumbershoot 2 policy's coverage to be triggered as to claims that are covered under the Bumbershoot 2 policy. Rather, the NYMAGIC Bumbershoot 2 policy clearly provides coverage for "all protection and indemnity risks" and "all other sums which the 'Assured' shall become legally liable to pay . . . in respect of claims made against the 'Assured' for damages of whatsoever nature, on account of . . . 'property damage' . . .," unless, of course, the claims for which Settoon seeks coverage under the NYMAGIC Bumbershoot 2 policy are specifically excluded from coverage under that policy.

The NYMAGIC Bumbershoot 2 policy also includes a "Dip Down/Non Concurrency Extension" which provides, in pertinent part:

5. DIP DOWN/NON CONCURRENCY EXTENSION

In the event of reduction or exhaustion of the aggregate limits of liability under said Underlying Insurances by reason of losses paid thereunder, subject to all the terms, conditions and definitions hereunder, this policy shall,

(a) in the event of reduction pay the excess of the reduced underlying limit.

(b) in the event of exhaustion continue in force as underlying insurance.

---

[9] The SNIC Bumbershoot 1 with a limit of liability of $4,000,000 is listed as excess of the SNIC protection and indemnity policy with a limit of liability of $1,000,000, among other policies.

*     *     *

    Such coverage as is afforded by this extension shall be subject to the following conditions:

*     *     *

    (b) It is further agreed that there shall be no reduction or exhaustion of an underlying aggregate limit or limits in the event of a claim or claims for which there would be no excess coverage under the terms and conditions of this policy.

*     *     *

The "Dip Down/Non Concurrency Extension" is a clause often found in umbrella excess insurance policies whereby the umbrella policy will "'drop down' and provide coverage in situations in which the primary underlying insurance policy does not apply." 26-163 Appleman on Insurance § 163.3 (2d ed. 2004). This clause provides that the NYMAGIC Bumbershoot 2 umbrella policy will "drop down" to become underlying insurance if the aggregate limits of liability of the actual underlying policies are exhausted by paying other losses. Liability insurance policies are generally "subject to an aggregate and occurrence limit." 3-16 Appleman on Insurance § 16.09 (2d ed. 2004). Occurrence limits provide the amount coverage for events that happen during the policy period, whereas, "[a]n aggregate limit establishes the maximum amount the policy will pay for a specified type of damage" by placing "a cap on the insurer's liability for all specified types of damage, regardless of the number of occurrences in the policy period." Id. Thus, "[l]iability policies without aggregate limits expose insurers to unspecified liabilities" depending on the number of occurrences during the policy period. Id.

    In this case, the underlying insurance does apply, and their limits of liability were not exhausted by paying claims on occurrences other than those related to the January 20, 2007, allision.

14

Settoon is not asking NYMAGIC to "drop down" and fill in a gap of insurance coverage, rather it is seeking excess coverage over the underlying insurance for liabilities related to the same occurrence. Although the pollution damages paid by the underlying insurers are excluded from coverage under the NYMAGIC Bumbershoot 2 policy, the attorneys' fees and expenses claim is not excluded. The basic Insuring Agreement of the NYMAGIC Bumbershoot 2 policy does not require that the claims paid by the underlying insurers also be covered by the NYMAGIC Bumbershoot 2 policy for coverage under that policy to be triggered, unless the NYMAGIC Bumbershoot 2 policy is "dropping down" to become an underlying insurer to fill a gap in coverage created by the actual underlying insurers' payments of claims related to other occurrences. Therefore NYMAGIC's motion for summary judgment is DENIED as to Settoon's claim for attorneys' fees and expenses and any bad faith claim associated with NYMAGIC's failure to pay attorneys' fees and expenses.

## CONCLUSION

**IT IS HEREBY ORDERED** that New York Marine & General Insurance Company's Motion for Summary Judgment (Doc. #648) is **GRANTED** as to Settoon Towing, L.L.C.'s claims for (1) cost of replacing ExPert's well in the amount of $2,105,831.98 plus interest; (2) plugging and abandonment expenses in the amount of $76,641.66 plus interest; (3) loss of product in the amount of $74,400 plus interest; (4) deferral of production in the amount of $362,500 plus interest; (5) interest on money it borrowed to fund the settlements; and, (7) bad faith damages on those claims, and such claims are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** as to Setton's claim for attorneys' fees and expenses in the limitation action, plus interest thereon and bad faith damages as to that claim.

**IT IS FURTHER ORDERED** that Settoon Towing, L.L.C.'s Motion to Strike Affidavit of R. Bryan Tilden from the Summary Judgment Record (Doc. #666) is **DENIED** as moot because the court did not rely on Tilden's affidavit in reaching its decision on NYMAGIC's motion for summary judgment.

New Orleans, Louisiana, this __3rd__ day of January, 2014.

_____
**MARY ANN VIAL LEMMON
UNITED STATES DISTRICT JUDGE**